NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11980

COMMONWEALTH  vs.  JAMIL J. CAMPBELL.


Suffolk.     February 10, 2016. - September 30, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, & Lenk,
JJ.[1]


Motor Vehicle, Operation, Permission to operate, Unauthorized
    use.  Constitutional Law, Search and seizure, Probable
    cause.  Search and Seizure, Probable cause, Inevitable
    discovery, Motor vehicle.  Probable Cause.  Practice,
    Criminal, Motion to suppress.



Complaint received and sworn to in the Roxbury Division of
the Boston Municipal Court Department on August 19, 2013.

After transfer to the Central Division, a pretrial motion
to suppress evidence was heard by Charles R. Johnson, J.

An application for leave to prosecute an interlocutory
appeal was allowed by Lenk, J., in the Supreme Judicial Court
for the county of Suffolk, and the case was reported by her to
the Appeals Court.  The Supreme Judicial Court granted an
application for direct appellate review.


Helle Sachse, Assistant District Attorney, for the
Commonwealth.

_____

[1] Justices Spina, Cordy, and Duffly participated in the
deliberation on this case prior to their retirements.

Rebecca A. Jacobstein, Committee for Public Counsel Services (Aditi Goel, Committee for Public Counsel Services, with her) for the defendant.

LENK, J.  On August 17, 2013, at approximately 4:30 P.M., Trooper Thomas Hannon of the State police stopped a vehicle driven by the defendant for failing to stop at a stop sign.  The vehicle had been rented by the defendant's mother, who has a last name that is different from the defendant's.  Upon request, the defendant provided Hannon with a valid driver's license and the rental agreement.  The agreement listed only the mother as the renter and stated, "[N]o other drivers permitted."  Hannon concluded that the defendant was using the vehicle without authority, in violation of G. L. c. 90, § 24 (2) (a), which makes it illegal to "use[] a motor vehicle without authority knowing that such use is unauthorized."  Accordingly, he decided to impound the vehicle.  During an inventory search in preparation for impoundment, a loaded handgun and a box of ammunition were seized from the vehicle.  The Commonwealth maintains that, upon learning of the seizures, the defendant made incriminating statements to police.

This case is before us on the Commonwealth's interlocutory appeal from a Boston Municipal Court judge's order allowing the defendant's motion to suppress the handgun, the ammunition, and statements he made to police.  We conclude that the inventory

search was unlawful under the circumstances, and therefore affirm the allowance of the motion to suppress.

Background and prior proceedings. The defendant was arrested on August 17, 2013, and charged with unlawful possession of a firearm, G. L. c. 269, § 10 (a); unlawful possession of a loaded firearm, G. L. c. 269, § 10 (n); unlawful possession of ammunition without a firearm identification card, G. L. c. 269, § 10 (h); and unauthorized use of a motor vehicle, G. L. c. 90, § 24 (2) (a). He also was given a civil citation for failure to stop at a stop sign, G. L. c. 89, § 9. At an evidentiary hearing on May 14, 2014, a judge of the Boston Municipal Court heard testimony from multiple witnesses, including Hannon, Trooper John McCarthy of the State police, and the defendant.

Hannon testified as follows. On the day of the seizure, he was monitoring the flow of traffic at the Heath Street rotary in the Roxbury section of Boston. He explained that there had been several instances of recent violence in the area, including shootings and gang-related incidents. When Hannon saw the defendant's vehicle fail to stop at a stop sign, he stopped the vehicle on Heath Street in a residential area, where the defendant provided his driver's license and the rental

agreement.[2]  Other than the fact that the defendant's name was
not on the rental agreement, Hannon had no basis to believe that
the vehicle was stolen -- the defendant had a key for the
vehicle, the defendant's license was valid, and the vehicle
appeared to be in good condition.  In addition, there was no
evidence suggesting that the rental period for the vehicle had
expired, or that the vehicle had been reported stolen.  The
defendant did not appear to Hannon to be nervous, never made any
furtive or threatening gestures, and was generally cooperative.

Hannon did not remember asking the defendant during the
traffic stop whether he knew the person whose name was on the
rental agreement, or if that person had given him permission to
drive the vehicle.  Hannon stated that he did not attempt to
contact the rental car company to determine whether the
defendant was authorized to drive the vehicle, and did not
recall whether a civilian dispatcher had telephoned on his
behalf.  Nonetheless, because the defendant's name was not on
the rental agreement, Hannon informed the defendant that the
vehicle was going to be impounded for unauthorized use.
Although Hannon had not yet decided whether he would place the
defendant under arrest, he placed the defendant in the rear

---

[2] Only the first page of the rental agreement is in the
record.  The agreement apparently is four pages long.

passenger seat of his police cruiser, uncuffed, and initiated an inventory search of the rental vehicle.

Hannon further testified that he found the handgun in the center console during that search.  At that point, he informed the defendant of the Miranda rights and asked whether the defendant had a license to carry the weapon.  According to Hannon, the defendant then stated, "No.  I got problems with some dudes and bought the gun on the street for my protection."  Hannon also said that, at some point during the stop, he learned from a police dispatcher that there was a default warrant for the defendant for failing to appear for jury duty.

McCarthy testified that he arrived at the scene after hearing a request for assistance on his police radio, and saw the defendant sitting handcuffed in Hannon's cruiser.[3]  McCarthy then found the box of ammunition in the rental vehicle.  McCarthy testified that he told the defendant that he had an outstanding warrant for failure to appear for jury duty, and that the defendant told him in response that he had purchased the firearm to protect himself.

The defendant, on the other hand, testified that he told Hannon that his mother had rented the vehicle and had given him permission to use it.  The defendant also testified that Hannon

---

[3] The defendant apparently already had been arrested for unlawful possession of the loaded handgun by the time McCarthy arrived.

had spoken with the defendant's mother on the telephone during the traffic stop, and that the defendant's mother told the trooper that the defendant had permission to drive the vehicle. The defendant denied knowing that there was a firearm in the vehicle, and stated that he did not recall what he had said to police during the stop.  The defendant also denied that he had been informed of the Miranda rights until he was under arrest and being driven to the State police barracks.  He testified that he said nothing to police after being informed of those rights.

The motion judge allowed the defendant's motion to suppress in a handwritten, signed order that was dated July 1, 2014.  The judge wrote,

> "Allowed:  Trooper Hannon lawfully stopped [the defendant's] vehicle for failure to stop it at a posted stop sign as required by law.  However, the absence of [the defendant's] name on the [rental] agreement without more is not sufficient justification under the circumstances presented for the arrest of [the defendant] for "[u]se without authority" or any of the other consequences which befell [the defendant] as a result of the traffic stop by [the trooper].  The gun, ammunition and the statements made by [the defendant] should be suppressed and not admitted at trial."

On July 5, 2014, the motion judge retired, and the case was assigned to another judge for trial.  The motion judge's suppression order was entered on July 11, 2014.

On July 18, 2014, the Commonwealth filed a motion to vacate the suppression order on the ground that the order was entered

after the motion judge's retirement. On August 4, 2014, the Commonwealth filed an application in the county court for leave to pursue an interlocutory appeal pursuant to Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996), and G. L. c. 278, § 28E. The following day, the Commonwealth withdrew its motion to vacate the suppression order. On September 2, 2014, a single justice of this court allowed the Commonwealth's application for leave to pursue an interlocutory appeal in the Appeals Court. Thereafter we allowed the defendant's application for direct appellate review.

Discussion. In reviewing an order allowing a motion to suppress, we consider "the facts found or implicitly credited by the motion judge, supplemented by additional undisputed facts where they do not detract from the judge's ultimate findings." Commonwealth v. Jessup, 471 Mass. 121, 127-128 (2015). We accept the judge's subsidiary findings of fact absent clear error, "but conduct an independent review of [the judge's] ultimate findings and conclusions of law." Id. at 129, quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004). "[O]ur duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." Commonwealth v. Mercado, 422 Mass. 367, 369 (1996).

The Commonwealth contests the motion judge's conclusion that the inventory search of the vehicle was unlawful. Whether an inventory search is lawful "is contingent on the propriety of the impoundment of the [vehicle]." Commonwealth v. Oliveira, 474 Mass. 10, 13 (2016), quoting Commonwealth v. Brinson, 440 Mass. 609, 612 (2003). The appropriateness of impoundment, in turn, is guided by a "touchstone of reasonableness." Commonwealth v. Eddington, 459 Mass. 102, 109 n.12 (2011).[4] Where police have probable cause to believe that a vehicle is being operated illegally, impoundment may be appropriate in some circumstances even if the driver is not under arrest. See Commonwealth v. Daley, 423 Mass. 747, 750 (1996) ("Here, the fact that the defendant was not under arrest is irrelevant to the propriety of the impoundment because the vehicle at issue was unregistered, uninsured, and had attached plates belonging to another vehicle").[5] Even so, "an inventory search must not be a ruse for a general rummaging in order to discover

---

[4] The decision to impound a vehicle also must be made in accordance with standard, written police operating procedures in order to comply with art. 14 of the Massachusetts Declaration of Rights. Commonwealth v. Eddington, 459 Mass. 102, 108 n.11 (2011), citing Commonwealth v. Ellerbe, 430 Mass. 769, 773 n.8 (2000).

[5] See also G. L. c. 90, § 24 (2) (a) ("A summons may be issued instead of a warrant for arrest upon a complaint for [use without authority] if in the judgment of the court or justice receiving the complaint there is reason to believe that the defendant will appear upon a summons").

incriminating evidence." Florida v. Wells, 495 U.S. 1, 4 (1990).  The Commonwealth bears the burden of proving the propriety of the impoundment.  See Commonwealth v. Craan, 469 Mass. 24, 28 (2014).

The Commonwealth argues that impoundment was appropriate here because Hannon had probable cause to believe that the defendant was using the vehicle without authority, in violation of G. L. c. 90, § 24 (2) (a).[6]  In the alternative, the Commonwealth argues that impoundment otherwise would have been appropriate based on the default warrant, and that the defendant's motion to suppress therefore should have been denied pursuant to the inevitable discovery rule.  We address each argument in turn.[7]

1.  Use without authority.  Although there was conflicting testimony at the motion hearing regarding the extent to which Hannon investigated the defendant's authority to drive the

---

[6] On appeal, the Commonwealth asserts, and the defendant does not dispute, that there was probable cause for the initial traffic stop.

[7] The Commonwealth additionally seeks a new evidentiary hearing, arguing that the suppression order at issue is not valid because it was entered after the motion judge's retirement.  This argument is without basis.  See Nessralla v. Peck, 403 Mass. 757, 761 (1989) (handwritten order signed before judge's retirement is valid although not issued in final form until after retirement).  In any event, the argument has been waived; the Commonwealth withdrew its motion in the Boston Municipal Court to vacate the suppression order on August 5, 2014, the day after it sought leave to pursue an interlocutory appeal.  See Commonwealth v. Cowels, 470 Mass. 607, 617 (2015).

vehicle at the time of the stop, we infer from the written order that the judge found that the trooper decided to impound the vehicle based solely on the absence of the defendant's name on the rental agreement and the fact that the agreement stated explicitly that no other drivers were permitted besides the listed renter. Given the testimony described above, that finding was not clearly erroneous. Accordingly, we consider whether that information on its own supplied probable cause to believe that the defendant was using the vehicle without authority, in violation of G. L. c. 90, § 24 (2) (a).

a. Statutory construction. General Laws c. 90, § 24 (2) (a), provides, in relevant part, "whoever uses a motor vehicle without authority knowing that such use is unauthorized shall . . . be punished." The crime comprises at least four distinct elements: (1) use; (2) of a motor vehicle; (3) without authority; (4) knowing that such use is unauthorized. See Commonwealth v. Giannino, 371 Mass. 700, 702 (1977).[8] The Commonwealth argues that, in the rental context, the rental company, not the renter, must provide the requisite authority to

---

[8] We also previously have required the Commonwealth to establish that the use at issue took place "in a public way." See Commonwealth v. Giannino, 371 Mass. 700, 702 (1977). But see Commonwealth v. Morris M., 70 Mass. App. Ct. 688, 696 (2007) (concluding that "public way" is not element of crime of use without authority).

use its vehicle if the rental agreement only permits use by listed drivers.

This court has not yet considered what constitutes use of a rental vehicle "without authority" pursuant to G. L. c. 90, § 24 (2) (a).[9] Looking first to the plain meaning of the statute, see Commonwealth v. Chamberlin, 473 Mass. 653, 660 (2016), we note that G. L. c. 90, § 24 (2) (a), is silent regarding the meaning of "authority" or who can provide it. Accordingly, we interpret the word "authority" in light of its "usual and accepted meaning[]." See Commonwealth v. Bell, 442 Mass. 118, 124 (2004), quoting Commonwealth v. Zone Book, Inc., 372 Mass. 366, 369 (1977). Recent dictionary definitions for "authority" include "a power or right delegated or given," Webster's New Universal Unabridged Dictionary 139 (2003), "[p]ower assigned to another," The American Heritage Dictionary

---

[9] The Appeals Court has suggested on several occasions that only a driver authorized under the express terms of a rental agreement may drive a rental vehicle without violating G. L. c. 90, § 24 (2) (a). See, e.g., Commonwealth v. Lawson, 79 Mass. App. Ct. 322, 326 n.4 (2011) (assuming in dicta that "[o]nly the rental company could authorize the defendant to drive the vehicle"); Commonwealth v. Watts, 74 Mass. App. Ct. 514, 518 (2009) (noting in dicta that police could have impounded rental vehicle after learning during traffic stop that driver's rental agreement had expired); Commonwealth v. Henley, 63 Mass. App. Ct. 1, 5-6 (2005) (concluding that police had probable cause to impound rental vehicle during traffic stop after learning that driver had expired license, and that neither driver nor passengers who had valid licenses were authorized drivers under terms of rental agreement). To the extent that our holding today may conflict with the Appeals Court's decisions, those decisions are overruled.

of the English Language 124 (3d ed. 1996), and "delegated power over others," Webster's Third New International Dictionary 146 (1993). Each of these definitions describes a situation in which someone in possession of a certain power transfers that power to, or shares it with, another.

In accordance with these definitions, we previously have noted that the "authority" described in G. L. c. 90, § 24 (2) (a), may be provided either by the owner of a vehicle or "by one who in law possesses the right of control ordinarily vested in the owner." Commonwealth v. Coleman, 252 Mass. 241, 243 (1925).[10] Accord Instruction 5.660 of the Criminal Model Jury Instructions for Use in the District Court (2009). In Commonwealth v. Coleman, supra at 242, we affirmed a defendant's conviction of use without authority under G. L. c. 90, § 24, for riding in a vehicle that was operated by a driver who did not have permission to drive it from the owner of the vehicle. Although the defendant argued that he was unaware that the driver lacked authority to operate the vehicle, we concluded that the version of G. L. c. 90, § 24, in effect at the time subjected users of a vehicle without authority to strict

---

[10] Definitions of "authority" at the time were similar to today's. See Webster's New International Dictionary of the English Language 155 (1926) (defining "authority" as "[l]egal or rightful power; a right to command or act; power exercised by a person in virtue of his office or trust").

liability.[11]  See id. at 244.  In so doing, we recognized that a person lawfully in control of a vehicle may authorize another's use.  Id. at 243.

We think it plain that authorization to use a rental vehicle may be provided by renters as well as by the rental company in at least some circumstances.  Under standard rental agreements like the one in this case, the renter, not the rental company, legally possesses the right of control of the vehicle, at least during the rental period.  The renter may, for example, decide when to use the vehicle, where to drive it, and whom to invite along for the ride.[12]  Nonetheless, the Commonwealth argues that a renter's right of control is limited by the terms of the rental agreement.  In its view, if the rental agreement prohibits use of the vehicle by those whom the agreement has not authorized explicitly, knowing use of this sort violates G. L. c. 90, § 24 (2) (a).  Considering the statute in context, we do not agree.

Our understanding of "without authority" in the rental context is shaped by "the aims and remedies intended to be

---

[11] General Laws c. 90, § 24 (2) (a), subsequently was amended to include a scienter requirement.  See St. 1926, c. 253 (inserting phrase "knowing that such use is unauthorized").

[12] In the tort liability context, we previously have suggested that a rental company is "unlikely" to retain any right of control over a renter's operation of a rental vehicle during the rental period.  See Cheek v. Econo-Car Rental Sys. of Boston, Inc., 393 Mass. 660, 663 (1985).

advanced by the Legislature . . . as evidenced by other parts of the statute as well." Quincy City Hosp. v. Rate Setting Comm'n, 406 Mass. 431, 442 (1990). The other crimes enumerated in G. L. c. 90, § 24 (2) (a), aim at two main purposes: protecting the public from reckless and negligent drivers, and ensuring that those who drive unsafely may be held accountable for any damage they cause.[13] See Opinion of the Justices, 250 Mass. 591, 601 (1925) (explaining that statute was enacted "for the particular protection of travellers upon the highways . . . and to afford them means of redress in case of injury by enabling them readily to ascertain the name and address of the owner of an automobile from which they might suffer injury"). This context indicates that the criminalization of using a vehicle "without authority" similarly is aimed at protecting the public from harm caused by

---

[13] Crimes addressing the public safety goal include "operat[ing] a motor vehicle recklessly" in any place where "the public has a right of access," "operat[ing] such a vehicle negligently so that the lives or safety of the public might be endangered," and operating a vehicle "upon a bet or wager or in a race." G. L. c. 90, § 24 (2) (a). Crimes addressing the accountability goal include leaving the scene after an accident "without stopping and making known [one's] name, residence and the register number of [one's] motor vehicle," "loan[ing] or knowingly permit[ting] [one's] license or learner's permit to operate motor vehicles to be used by any person," "mak[ing] false statements in an application for . . . a license or learner's permit," and "knowingly mak[ing] any false statement in an application for registration of a motor vehicle." Id.

a user of a motor vehicle who is not readily identifiable.[14]

Punishing a person who uses a vehicle with the permission of someone who is in lawful possession of the vehicle, such as a renter, does not advance that purpose, because a user with such permission readily may be identified by the person with explicit authority to use the vehicle.

Furthermore, we previously have described G. L. c. 90, § 24 (2) (a), as "a lesser included offense under a charge of larceny" of a motor vehicle, G. L. c. 266, § 28, because the

---

[14] In enacting G. L. c. 90, § 24 (2) (a), the Legislature apparently assumed that a person who uses a vehicle without authority is more likely to use it recklessly or negligently than a person who uses the vehicle with authority. See G. L. c. 90, § 24F (making persons convicted of use without authority civilly liable for damage caused to vehicle by their use). Commentators likewise have suggested that G. L. c. 90, § 24 (2) (a), primarily was intended to criminalize unsafe "joyriding." See Simonian & Tarantino, Common Criminal Motor Vehicle Offenses in Massachusetts Motor Vehicle Offenses: Criminal, Civil, and Registry Practice § 3.11 (Mass. Cont. Legal Educ. 2d ed. Supp. 2016); R.J. Kenney, Jr., T.J. Farris, & P.R. Keane, Motor Vehicle Law and Practice § 28:50 (4th ed. Supp. 2015). As one commentator has explained,

> "The social problem back of this legislation is well known. When the automobile began to appear and was limited to the possession of a few of the more fortunate members of the community, many persons who ordinarily respected the property rights of others, yielded to the temptation to drive one of these new contrivances without the consent of the owner. This became so common that the term 'joyrider' was coined to refer to the person who indulged in such unpermitted use of another's car. . . . The chief harm was due to the fact that the 'joyrider' was frequently not a skillful driver, and sometimes unintentionally damaged the car while using it."

R.M. Perkins & R.N. Boyce, Criminal Law 333 (3d ed. 1982).

crime that is sought to be prevented involves depriving someone temporarily of the use of a vehicle, not permanently depriving the owner of that vehicle of his or her ownership. See Commonwealth v. Giannino, 371 Mass. 700, 703 (1977). A person who has been authorized by the renter listed on the rental agreement to use the vehicle during the rental period does not deprive the rental company of any short-term use to which it otherwise would have been entitled.

The Commonwealth argues that we should apply the definition of "authorized driver" under G. L. c. 90, § 32E1/2, which regulates collision damage waivers in vehicle rental agreements, in construing the meaning of "authority" under G. L. c. 90, § 24 (2) (a). Under G. L. c. 90, § 32E1/2 (A), an "authorized driver" is defined to include only "a renter who drives a private passenger automobile rented under the terms of a rental agreement or any person expressly listed by the rental company on the rental agreement as an authorized driver." Damage or loss incurred by drivers who are not so "authorized" may be excluded from the protection of a collision damage waiver. G. L. c. 90, § 32E1/2 (C) (5) (f).

By its own terms, however, the definition in G. L. c. 90, § 32E1/2 (A), applies only to that provision and to G. L. c. 90,

§ 32E3/4, neither of which criminalizes unauthorized use.[15] While concern about collision damage waiver liability may be one reason that rental agreements distinguish between authorized and unauthorized drivers, that question of civil liability in the event of an accident does not affect our interpretation of use "without authority" under G. L. c. 90, § 24 (2) (a), a criminal statute that imposes substantial penalties on those who violate it.[16]

A renter's decision to allow a person who is not a permitted driver according to the rental agreement to drive a rental vehicle may be a breach of that agreement, but it does not also result in a violation of criminal law.[17] We are aware

---

[15] See G. L. c. 90, § 32E1/2 (A) ("As used in this section and section 32E3/4 the following words and phrases shall have the following meanings unless the context requires otherwise").

[16] A first offense is "punished by a fine of not less than fifty dollars nor more than five hundred dollars or by imprisonment for not less than thirty days nor more than two years, or both." G. L. c. 90, § 24 (2) (a). Second and subsequent offenses are subject to more extensive fines and terms of imprisonment. Id.

[17] Other courts also have taken this view. See State v. Veniegas, 80 Haw. 75, 79 (Ct. App. 1995), overruled on another ground by State v. Vallesteros, 84 Haw. 295 (1997) (noting that use of rental vehicle with permission of renter by person not on rental agreement did not violate statute criminalizing use without authority); People v. Johnson, 71 Misc. 2d. 423, 427 (N.Y. Crim. Ct. 1972) (same); State v. Bass, 300 P.3d 1193, 1195 (Okla. Ct. Crim. App. 2013) (same). See also United States v. McLaughlin, 278 F. Supp. 320, 321 (D.D.C. 1967) ("To hold that one using a rented car in excess of authority given is subject to prosecution under the criminal laws . . . would be tantamount

of only one context in which the Legislature explicitly has criminalized the violation of a rental agreement:  under G. L. c. 266, § 87, a renter who "fails or refuses to return [the rental vehicle] to the owner within ten days after expiration of the . . . rental agreement" may be subject to criminal liability.  General Laws c. 90, § 24 (2) (a), however, is not similarly explicit.  In light of the usual and accepted meaning of "authority," and the purposes for which G. L. c. 90, § 24 (2) (a), apparently was enacted, we conclude that an individual does not violate G. L. c. 90, § 24 (2) (a), by using a rental vehicle with the renter's permission when the rental company also has not authorized that use.[18]  To hold otherwise would expose every parking lot attendant who knows he or she is parking a rental vehicle to potential criminal liability.

    b.  Probable cause.  Based on our construction of G. L. c. 90, § 24 (2) (a), we conclude that Hannon lacked probable cause to determine that the defendant was using the rental vehicle without authority.  "[P]robable cause exists where . . .

_____

to making a person criminally liable for a simple breach of contract").  But see United States v. Sanford, 806 F.3d 954, 959 (7th Cir. 2015) (suggesting that police may impound vehicle where driver is not authorized by rental company).

    [18] Contrast Md. Code Ann., Transp. § 18-106(b) (LexisNexis 2012) ("If a person rents a motor vehicle under an agreement not to permit another person to drive the vehicle no other person may drive the rented motor vehicle without the consent of the lessor or his agent").  This statute was repealed in 2014.  See Md. Code Ann., Transp. § 18-106(b) (LexisNexis Supp. 2015).

the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense." Commonwealth v. Stewart, 469 Mass. 257, 262 (2014), quoting Commonwealth v. Santaliz, 413 Mass. 238, 241 (1992).  "The officers must have entertained rationally 'more than a suspicion of criminal involvement, something definite and substantial, but not a prima facie case of the commission of a crime, let alone a case beyond a reasonable doubt.'"  Commonwealth v. Keefner, 461 Mass. 507, 517 (2012), quoting Commonwealth v. Santaliz, supra.

On the facts of this case, Hannon's determination that the defendant violated G. L. c. 90, § 24 (2) (a), was not reasonable.  Although the absence of the defendant's name on the rental agreement provided the trooper with a basis to investigate whether the authorized renter had permitted the defendant to use the vehicle, that information by itself could not establish probable cause to conclude that the defendant was in violation of the statute.  The asserted violation of G. L. c. 90, § 24 (2) (a), therefore did not provide a sufficient basis for the officer to impound the vehicle and conduct an inventory search.  See Maryland v. Pringle, 540 U.S. 366, 370 (2003), quoting Brinegar v. United States, 338 U.S. 160, 176 (1949) ("probable cause protects 'citizens from rash and

unreasonable interferences with privacy and from unfounded charges of crime'").

2. <u>Inevitable discovery</u>. The Commonwealth argues in the alternative that the motion to suppress should have been denied because the defendant could have been arrested on the default warrant for failure to appear for jury duty and the vehicle impounded on that basis, resulting in a lawful inventory search. "Under the inevitable discovery doctrine, evidence may be admissible as long as the Commonwealth can demonstrate that discovery of the evidence by lawful means was certain as a practical matter, 'the officers did not act in bad faith to accelerate the discovery of evidence, and the particular constitutional violation is not so severe as to require suppression.'" <u>Commonwealth</u> v. <u>Hernandez</u>, 473 Mass. 379, 386 (2015), quoting <u>Commonwealth</u> v. <u>Sbordone</u>, 424 Mass. 802, 810 (1997). In addition, the discovery must have been inevitable under the "circumstances existing at the time of the unlawful seizure" (citation omitted). <u>Commonwealth</u> v. <u>Perrot</u>, 407 Mass. 539, 548 (1990).

Discovery on the basis of the default warrant for failing to appear for jury duty would have required police both to execute the warrant and to impound the rental vehicle after that arrest. Yet neither trooper testified at the suppression hearing that they had intended to take these steps at the time

of the illegal seizure, and the record does not make clear whether the troopers had even learned of the existence of the default warrant before the seizure occurred.  Thus, the Commonwealth has not shown that it is "certain as a practical matter" that the seized evidence would have been discovered but for the impoundment of the defendant's vehicle based on unauthorized use.  See Commonwealth v. Barros, 56 Mass. App. Ct. 675, 679 (2002) (existence of default warrant, without more, does not make inevitable discovery of evidence certain as a practical matter).[19]

Conclusion.  The impoundment of the rental vehicle was not proper, because the police did not have probable cause to believe that the defendant was operating it in violation of G. L. c. 90, § 24 (2) (a), and it is not certain as a practical matter that they would have executed the default warrant and impounded the vehicle on that basis.  Accordingly, the inventory search was not lawful, and the handgun and ammunition properly were suppressed.  The defendant's statements in response to the discovery of those items also properly were suppressed.  See

---

[19] Because we conclude that there was not probable cause to believe that the defendant was operating the rental vehicle without authority, and that the evidence at issue would not have been discovered inevitably by other means, we do not reach the Commonwealth's arguments that the decision to impound the vehicle complied with the State police department's written policies.  See Commonwealth v. Eddington, 459 Mass. 102, 108-109 (2011).

Commonwealth v. Estabrook, 472 Mass. 852, 864-865 (2015)

(statements made directly in response to unlawful search must be

suppressed).

Order allowing motion
to suppress affirmed.
